# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION | ) ) ) |  |
|  | ) |  |
| *Plaintiff* | ) |  |
|  | ) |  |
| v. | ) | Civil Action No. <u>1:24</u>cv164 HSO-BWR |
|  | ) |  |
| LYNN FITCH, in her official capacity as ATTORNEY GENERAL OF THE STATE OF MISSISSIPPI | ) ) ) |  |
|  | ) |  |
| *Defendant*. | ) ) |  |

## <u>VERIFIED COMPLAINT</u>

Plaintiff Novartis Pharmaceuticals Corporation brings this Complaint against Defendant Lynn Fitch, in her official capacity as the Attorney General of the State of Mississippi, and alleges as follows:

### PRELIMINARY STATEMENT

1.      This is an action for temporary, preliminary, and/or permanent injunctive relief challenging the constitutionality of Mississippi's H.B. 728, which purports to dramatically expand the scope of a federal law mandating the sale of covered outpatient drugs at a discounted price to "covered entities"—non-profit hospitals and clinics meeting specified statutory criteria.

2.      The Supreme Court has held that state laws cannot be used to enforce the federal 340B statute, which requires drug manufacturers to provide deeply discounted prices on their covered outpatient drugs to qualifying covered entities. *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110 (2011).  That decision makes sense:  The federal 340B Program is a unified federal

regulatory scheme, carefully constructed by Congress, and governed by a comprehensive framework of federal statutes and regulations that collectively define the obligations imposed on regulated entities.   Allowing states to tinker with the federal framework would undermine Congressional objectives.

3.       H.B. 728 is deceptively called the "Defending Affordable Prescription Drug Costs Act."  But it does little to lower the costs of prescription drugs to patients.   The Mississippi law requires manufacturers to provide the federal 340B discount to covered entities on an unlimited number of transactions involving for-profit pharmacies (known as "contract pharmacies").  Several federal courts (including the Third Circuit, the D.C. Circuit, and the District Court for the District of Columbia) have held that federal 340B law does *not* require manufacturers to recognize an unlimited number of contract pharmacies.   Yet that is precisely what Mississippi's H.B. 728 purports to mandate, greatly expanding the scope of the federal discounting obligation in conflict with federal law.  H.B. 728 directly conflicts with Congress's carefully designed federal program and is therefore preempted by federal 340B law.

4.       H.B. 728 further conflicts with the federal 340B enforcement process by purporting to create its own state-level 340B enforcement mechanism.   Congress created two exclusive pathways to resolve disputes arising under the 340B statute: (i) direct enforcement by federal agencies, and (ii) an Administrative Dispute Resolution process that serves as the exclusive means for regulated entities to bring narrow types of private claims relating to 340B law.  Congress gave no authority to the States to administer, interpret, or enforce any aspect of the 340B Program.  Yet H.B. 728 purports to do exactly that.

5.       The Mississippi law also is preempted by federal laws governing the timing of drug approvals, including federal patent laws and the Food, Drug, and Cosmetic Act (FDCA) as

amended by the federal Drug Price Competition and Patent Term Restoration Act (commonly known as the Hatch-Waxman Act). In these statutes, Congress spelled out a grand bargain: Brand name manufacturers are driven to research, develop, and bring to market pharmaceutical products on the promise that they will obtain federally protected, exclusive rights to sell their products at market prices for specified periods of time. Once those periods expire, generic manufacturers are permitted to rely upon the drug development work done by innovator manufacturers by obtaining streamlined approval of generic products. H.B. 728 requires Novartis to make its drugs that are not covered by the federal 340B framework available at heavily discounted prices *before* those federally protected exclusivity periods have run, undermining the bargain carefully constructed by federal law. That frustrates the purposes of Congress.

6.     Absent immediate judicial intervention enjoining H.B. 728, Novartis will suffer irreparable harm. Once the law becomes effective on **July 1, 2024**, Novartis will risk violating Mississippi law merely by continuing to implement a contract pharmacy policy that has already been expressly declared lawful by other federal courts applying the federal 340B law. If H.B. 728 is not enjoined, Novartis will continue to suffer severe irreparable harm and loss of its constitutional rights on an ongoing basis. Novartis therefore requests a preliminary injunction enjoining enforcement of H.B. 728 pending a decision on the merits.

7.     For all of these reasons, Novartis brings this action seeking a declaration that H.B. 728 is unconstitutional and a temporary, preliminary, and/or permanent injunction barring Defendant from enforcing H.B. 728 against Novartis.

## PARTIES

8.      Plaintiff Novartis is a corporation organized in Delaware with its principal place of business at 59 Route 10, East Hanover, New Jersey 07936.  Novartis's purpose is to reimagine medicine to improve and extend people's lives.

9.      Defendant Lynn Fitch is the Attorney General for the State of Mississippi and is responsible for administering and enforcing the provisions of H.B. 728.  Defendant Fitch maintains offices at 550 High Street, Suite 1200, Jackson, Mississippi 39205, and at 1141 Bayview Avenue, Suite 402, Biloxi, Mississippi 39530.

## JURISDICTION AND VENUE

10.     Jurisdiction in this Court is grounded upon and proper under 28 U.S.C. § 1331, in that this civil action arises under the laws of the United States, and under 28 U.S.C. §§ 2201–02, in that there exists an actual justiciable controversy between the parties as to which Plaintiff requires a declaration of its rights by this Court and injunctive relief.

11.     This Court also has inherent equitable powers to enjoin the actions of state officials that contradict the U.S. Constitution and federal law.  *Ex parte Young*, 209 U.S. 123, 159–160 (1908); *United States v. South Carolina*, 720 F.3d 518, 526 (4th Cir. 2013).

12.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1) and (2) because Defendant maintains offices in Jackson and Biloxi, Mississippi, which are in this district, and/or because a substantial part of the events or omissions giving rise to the claim occurred in this district.  H.B. 728 purports to restrict Novartis's conduct in this district, and a substantial amount of Novartis's drug products are sold in this district.  The challenged state law also applies to contract pharmacy arrangements in this district.  H.B. 728 is therefore likely to be enforced against manufacturers in this district.

## FACTUAL BACKGROUND

4

**I. Statutory and Regulatory Background**

13.     Congress created the 340B Drug Pricing Program in 1992.  The program requires participating pharmaceutical manufacturers to provide deep discounts on certain drugs to specified types of healthcare providers—known as "covered entities"—as a condition of the availability of federal payments for such drugs under Medicaid and Medicare Part B.  42 U.S.C. § 256b.

14.     At its core, the 340B Program requires a participating pharmaceutical manufacturer to charge a covered entity no more than the 340B ceiling price—a discounted price calculated under a prescribed statutory formula—for each unit of a covered outpatient drug.  *Id.* §§ 256b(a)(1), (a)(4), (b)(1).  A participating manufacturer "shall offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price."  *Id.* § 256b(a)(1).

15.     The 340B Program is overseen by the federal Department of Health and Human Services (HHS) and its sub-agency, the Health Resources and Services Administration (HRSA).  To participate in the 340B Program, a manufacturer must enter a Pharmaceutical Pricing Agreement (PPA) with the federal government.  42 U.S.C. § 256b(a)(1).

16.     The "applicable ceiling price," or "340B price," is a steeply discounted rate—as low as one penny—calculated under a prescribed statutory formula.  *See* 340B Drug Pricing Program Ceiling Price and Manufacturer Civil Monetary Penalties Regulation, 82 Fed. Reg. 1210, 1214-15 (Jan. 5, 2017); 42 U.S.C. § 256b(a)(2).

17.     Congress intentionally limited the scope of sales that would trigger such a severe discount to those drugs "purchased by a covered entity."  42 U.S.C. § 256b(a)(1).  The statute carefully defined the term "covered entity" in a specific and exhaustive way, listing 15 types of entities that qualify for the discount.  *Id.* § 256b(a)(4) (listing federal grantees, black lung clinics,

family planning projects, and specified types of non-profit hospitals).  The statute does not require that the 340B discount be given to entities not included within the definition of "covered entity."

18.     In the first several years of the program, covered entities dispensed 340B-purchased drugs exclusively through their own in-house pharmacies.  But over time, covered entities sought to be able to dispense 340B-purchased drugs through contractual arrangements with third-party pharmacies (so-called "contract pharmacies") as well.  Under these arrangements, instead of drugs being shipped to the covered entity for dispensing by its in-house pharmacy, drugs are shipped to the contract pharmacy—often a large, national chain—for dispensing there.

19.     Contract pharmacy arrangements, including those in Mississippi, traditionally involve a "virtual inventory" or "replenishment" model.  Under this model, the contract pharmacy starts with an inventory of commercially purchased product and dispenses all units of the drug from this common inventory, regardless of whether the individual to whom a unit is dispensed is a patient of the covered entity.  That is because the contract pharmacy itself typically has not determined at the time of dispensing whether the individual receiving the prescription is a "patient" of the covered entity.  That determination is made afterward.  Where it believed, based on an opaque formula generally not shared with the manufacturer, that the individual is a covered-entity patient, the covered entity purchases a "replenishment" unit at the 340B price and directs shipment to the contract pharmacy—which commingles the 340B-purchased unit with commercially purchased units in its common inventory.  The 340B replenishment unit is treated as it if had been purchased at the commercial price—and thus is available for dispensing to anyone, including a non-patient of the covered entity—even though it has in fact been purchased at the 340B price. *See Novartis Pharms. Corp. v. Johnson*, No. 21-5299 (D.C. Cir. May 21, 2024) ("Slip Op."), at 16–18; *see also* HHS OIG, *Memorandum Report: Contract Pharmacy Arrangements in the 340B*

*Program*, OEI-05-13-00431 at 5 (Feb. 4, 2014), *available at* https://oig.hhs.gov/oei/reports/oei05-13-00431.pdf.

20.     The statute provides for only two enforcement mechanisms.  First, the statute provides for the imposition of civil monetary penalties (CMPs) on manufacturers that knowingly and intentionally charge a covered entity a price for a 340B drug that exceeds the ceiling price. 42 U.S.C. § 256b(d)(1)(B)(vi)(III).  HRSA has taken the position that implementation of this statutory remedy requires a referral to the HHS Office of Inspector General (OIG).

21.     In addition, the statute required the Secretary of HHS to promulgate regulations establishing an ADR process to resolve specific categories of private disputes between covered entities and manufacturers arising under the 340B Program.  42 U.S.C. § 256b(d)(3).  The statute specifically describes two narrow claim categories that are funneled to administrative dispute resolution:  (1) "claims by covered entities that they have been overcharged for drugs purchased under this section," and (2) claims by manufacturers relating to duplicate discounts and drug diversion.  42 U.S.C. § 256b(d)(3)(A).  In promulgating ADR regulations, the agency has recently interpreted these provisions—rightly or wrongly—to include a claim "that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price."  89 Fed. Reg. 28,643, at 28,657 (Apr. 19, 2024).

22.     There are no other enforcement mechanisms contemplated by the 340B statute.

**II.  HRSA's Changing Position on Contract Pharmacies**

23.     Over time, HRSA's position on contract pharmacies has evolved.

24.     In 1996, the agency issued guidance announcing that the agency would not preclude covered entities lacking an in-house pharmacy from entering into a contractual relationship with a

single outside pharmacy to dispense covered outpatient drugs to the covered entity's patients.  61 Fed. Reg. 43,549 (Aug. 23, 1996).

25.      In 2010, HRSA issued revised guidance on contract pharmacy arrangements, stating that covered entities may be permitted to "use" an untold number of "multiple pharmacy arrangements"—with no limits on their physical location, and even if the covered entity had its own in-house pharmacy—"as long as they comply with guidance developed to help ensure against diversion and duplicate discounts and the policies set forth regarding patient definition."  75 Fed. Reg. 10,272, 10,273 (Mar. 5, 2010).  HRSA's 2010 Guidance thus purported to authorize covered entities to enter into a limitless number of contract pharmacy arrangements with any pharmacy located anywhere in the United States.

26.      That decision had striking consequences.  Over the ensuing years, the number of contract pharmacies receiving and distributing 340B drugs grew at a rapid clip.  By 2018, the Government Accountability Office found that the number of contract pharmacies had ballooned from 1,300 in 2010 to nearly 20,000 by 2017.  Government Accountability Off., *Drug Discount Program, Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement*, at 36 (June 2018), https://www.gao.gov/assets/gao-18-480.pdf.  This report echoed findings from the Department of Health and Human Services' Office of Inspector General, which similarly documented dramatically increased use—and abuse—of 340B discounts through covered entities' contract pharmacy relationships.  HHS OIG, *Memorandum Report:  Contract Pharmacy Arrangements in the 340B Program*, No. OEI-05-00431 at 9–10, 16 (2014), https://oig.hhs.gov/oei/reports/oei-05-13-00431.pdf.

27.      Neither covered entities nor their contract pharmacies are required to pass on 340B discounts to patients, and often they do not.  Instead, covered entities and contract pharmacies are

permitted to (and often do) pocket the discount themselves. Over time, 340B expenditures have swelled as contract pharmacy arrangements, and the profits they generate for covered entities and contract pharmacies alike, proliferated. By 2020, sales of 340B units constituted an estimated 7% of the entire U.S. prescription drug market and 17% of all total U.S. branded outpatient drug sales. Karen Mulligan, *The 340B Drug Pricing Program: Background, Ongoing Challenges and Recent Developments* (Oct. 14, 2021), *available at* https://healthpolicy.usc.edu/research/the-340b-drug-pricing-program-background-ongoing-challenges-and-recent-developments; Eleanor Blalock, *Measuring the Relative Size of the 340B Program: 2020 Update* (June 2022), *available at* https://media.thinkbrg.com/wp-content/uploads/2022/06/30124832/BRG-340B-Measuring-Relative-Size-2022.pdf. In 2022, discounted purchases under the 340B Program hit a record high of approximately $54 billion—a more than 22% year-over-year increase. *Id.*; *see also* Adam J. Fein, *The 340B Program Reached $54 Billion in 2022—Up 22% vs. 2021*, Drug Channels (Sept. 24, 2023).

### III. Novartis's Contract Pharmacy Policy and Resulting Litigation

28. Concerned about ever-increasing abuse through fast-multiplying contract-pharmacy arrangements, in late 2020, Novartis notified HRSA of its plans to implement a contract pharmacy policy. Beginning in November 2020, Novartis explained, it would recognize all contract pharmacies within 40 miles of a covered entity—an area of more than 5,000 square miles—and allow covered entities to seek exemptions based on individual circumstances. Novartis's 40-mile limitation did not apply to covered entities that are federal grantees.

29. In early 2021, HRSA issued a violation letter to Novartis, contending that Novartis's policy violated the statute and demanding immediate compliance with HRSA's view

that, at the unilateral direction of a covered entity, a manufacturer is obligated to deliver 340B drugs to any contract pharmacy, on pain of an enforcement action.

30.     Upon receiving HRSA's violation letter, Novartis immediately challenged the agency action in the U.S. District Court for the District of Columbia.  *See Novartis Pharms. Corp. v. Espinosa*, No. 1:21-cv-01479 (D.D.C.) (filed May 31, 2021).  Novartis's challenge was heard alongside a later case brought by United Therapeutics, which had also received a violation letter. *See United Therapeutics Corp. v. Espinosa*, No. 1:21-cv-01686 (D.D.C.).

31.     Following full briefing and argument, the District Court vacated HRSA's violation letters and issued a decision rejecting HRSA's purported requirement that manufacturers recognize an unlimited number of contract pharmacies as inconsistent with the language of the 340B statute. *Novartis Pharms. Corp. v. Espinosa*, No. 21-CV-1479, 2021 WL 5161783 (D.D.C. Nov. 5, 2021). As the District Court explained, HRSA's enforcement letters rested on the contention that the 340B statute "prohibit[s] drug manufacturers from attaching any conditions to the sales of covered drugs through contract pharmacies," but that the 340B statute does no such thing.  *Id.* at *9.  In sum, the District Court held that "[t]he statute's plain language, purpose, and structure do not prohibit drug manufacturers from attaching any conditions to the sales of covered drugs through contract pharmacies."  *Id.*

32.     On May 21, 2024, the D.C. Circuit affirmed, holding that the federal 340B statute's "requirement to 'offer' drugs at a certain 'price' does not prohibit distribution conditions, much less require the offeror to accede to any distribution conditions, much less require the offeror to accede to any distribution terms demanded by the offeree."  *Novartis Pharms. Corp. v. Johnson*, Slip Op., at 16.  The D.C. Circuit also noted that statutory silence on contract pharmacies does not mean that manufacturers are required to recognize an unlimited number of them.  "Statutory

silence implies that manufacturers may impose distribution conditions by contract, not that they are prohibited from doing so." *Id.* at 14. The Court thus held that Novartis's contract pharmacy policy does not violate the federal 340B statute, and affirmed the vacatur of HRSA's violation letter.

33.     In a parallel lawsuit brought by other drug manufacturers, the U.S. Court of Appeals for the Third Circuit likewise rejected the notion that Section 340B requires manufacturers to recognize an unlimited number of contract pharmacy arrangements. *See Sanofi Aventis U.S. LLC v. United States Dep't of Health & Human Servs.*, 58 F.4th 696 (3d Cir. 2023). The unanimous Third Circuit panel held unlawful HHS's efforts to enforce its interpretation of Section 340B against drug manufacturers that imposed delivery conditions on sales to covered entities using contract pharmacies. *Id.* at 699. In so doing, the Third Circuit held that "Section 340B does not require delivery to an unlimited number of contract pharmacies." *Id.* at 703. It identified multiple structural indicators that not only confirmed this reading of Section 340B but further indicated that the omission reflected Congress' intent that unlimited contract pharmacies <u>not</u> be required.

34.     Critically, the Third Circuit noted that "[n]owhere does Section 340B mention contract pharmacies," and inferred based on the language and structure of the statute that Congress's decision to omit contract pharmacies from the list was not an unintentional gap, but was done intentionally. The Court noted, Congress "expressly contemplate[d] drug makers selling discounted drugs through contract pharmacies" in an adjacent provision of the same authorizing legislation relating to another (non-340B) program, but did not include similar language for the 340B program. *Id.* at 703–705.

35.     The Third Circuit also rejected the argument that manufacturers are required to deliver their 340B drugs anywhere that covered entities wish, including to third party contract

pharmacies, as "one giant leap from the text." *Id.* at 704.  To the contrary, "Congress's use of the singular 'covered entity' in the 'purchased by' language suggests that it had in mind one-to-one transactions between a covered entity and a drug maker without mixing in a plethora of pharmacies." *Id.*  Because the "drug makers' restrictions on delivery to contract pharmacies [did] not violate Section 340B," the Third Circuit "enjoin[ed] HHS from enforcing against them its reading of Section 340B as requiring delivery of discounted drugs to an unlimited number of contract pharmacies." *Id.* at 706.

36.     Following both the D.C. District Court's and the Third Circuit's decisions, Novartis announced in April 2023 that it was revising its contract pharmacy policy, effective May 3, 2023. In keeping with both decisions, Novartis's current policy permits hospital covered entities lacking an in-house pharmacy to select a single contract pharmacy location.  Novartis also recognizes any arrangements a hospital covered entity might have with contract pharmacies that the covered entity fully owns and controls.  Federal grantee covered entities continue to be exempt.  *See* Ex. A (April 3, 2023 Letter to Covered Entities on 340B Contract Pharmacy Policy).  Novartis's revised policy mirrors one of the manufacturer policies that the Third Circuit found lawful, and has now also specifically been found lawful by the D.C. Circuit.

**IV.  Mississippi Enacts Its Own "340B" Legislation.**

37.     On April 12, 2024, Mississippi enacted H.B. 728, which states in relevant part that a manufacturer or distributor "shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug by, or delivery of a 340B drug to, a pharmacy that is under contract with a 340B entity and is authorized under such contract to receive and dispense 340B drugs on behalf of the covered entity."  H.B. 728 § 4(1).[1]

---

[1] *Available at* https://billstatus.ls.state.ms.us/documents/2024/pdf/HB/0700-0799/HB0728SG.pdf

38.     The law sweeps broadly:  A manufacturer or distributor also "shall not interfere with a pharmacy contracted with a 340B entity."  H.B. 728 § 4(2).

39.     A "340B drug" is defined as a covered outpatient drug "that has been subject to any offer for reduced prices by a manufacturer pursuant to [the federal 340B statute]."  H.B. 728 § 2(a).  In other words, a "340B drug" is a drug that is sold at a 340B discount.

40.     A "340B entity" is defined to mean "an entity participating or authorized to participate in the federal 340B drug discount program, as described [in the federal 340B statute], including its pharmacy, or any pharmacy contracted with the participating entity to dispense drugs purchased through the 340B drug discount program."  *See* H.B. 728 § 2(b).

41.     Putting these definitions together, the Mississippi statute requires manufacturers like Novartis to provide the 340B discount on transactions that involve contract pharmacies.

42.     A manufacturer in violation of H.B. 728 faces penalties on numerous fronts.

43.     A violation of H.B. 728 constitutes an unfair, abusive, or deceptive trade practice under the Mississippi Consumer Protection Act (MCPA), *see* Miss. Code Ann. § 75-24-1 *et seq.*, subject to a spate of specified enforcement actions and penalties.  *See* H.B. 728 § 5.

44.     The statute provides for a fine of $10,000 per each knowing and willful violation or violation of an injunction.  *See* Miss. Code Ann. § 75-24-19.

45.     The law imposes criminal penalties as well:  A person who knowingly and willfully violates the MCPA is guilty of a misdemeanor and subject to a fine of up to $1,000 for the first violation.  That liability ratchets up for a second conviction.  A person convicted of a second violation is guilty of a misdemeanor and also subject a fine of up to $1,000 per violation and/or imprisonment for up to one year.  Miss. Code Ann. §§ 75-24-20(a), (b).  Upon a third or subsequent

conviction for violating H.B. 728, the liability escalates further still, resulting in a felony offense, threatening a fine of up to $5,000 per violation and imprisonment of up to five years.  Miss. Code Ann. § 75-24-20(c).

46.     Liability under H.B. 728 for would-be violators can mount quickly, not only because "[a] violation occurs each time a prohibited act is committed" under Mississippi's law, H.B. 728 § 5, but also because, under Mississippi law, convictions of comparable criminal offenses *in states beyond Mississippi* matter for "purposes of determining if a violation . . . is a first, second or third or subsequent offense":  The law provides that "[c]riminal convictions from other states for violations of substantially similar provisions . . . shall be counted."  Miss. Code Ann. § 75-24-20(d).

47.     A violation of H.B. 728 also subjects a manufacturer to "any and all actions, including investigative demands, remedies, and penalties provided for" in the MCPA.  H.B. 728.

48.     The MCPA vests additional powers with the Mississippi Attorney General, including the issuances of subpoenas, subpoenas duces tecum, cease and desist orders, and conducting hearings to investigate and "[c]ompel the production of books, papers, documents, and other evidence."  *See* Miss. Code. Ann § 75-24-27.

49.     In short, the penalties for a violation of H.B. 728 are dire.

### H.B. 728 IS UNLAWFUL

50.     H.B. 728 violates the Supremacy Clause of the U.S. Constitution, under both field and conflict preemption principles.

51.     It is of no moment that Mississippi's statute says that "[n]othing in this section shall be construed or applied to be conflict with . . . applicable federal law and related regulation."  H.B.

728 § 6(2).  Such a provision "cannot substantively operate to save an otherwise invalid statute." *Community in Solidarity with the People of El Salvador v. FBI*, 770 F.2d 468, 474 (5th Cir. 1985).

**Field Preemption**

52.     Field preemption exists where (1) Congress's "framework of regulation [is] 'so pervasive' " that Congress has "left no room for the States to supplement it," or (2) where there is a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."  *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  State statutes that diminish federal control over enforcement, and detract from a unified regulatory scheme that Congress has established, are especially likely to violate the Supremacy Clause under field preemption principles.

53.     The 340B Program is just that sort of integrated federal regulatory scheme.  It is a creature of a federal statute in which Congress has set out comprehensive regulatory parameters and supplied an exclusively federal framework for enforcement and dispute resolution.  The 340B statute carefully defines the types of entities that are entitled to receive the 340B discount, and provides its own enforcement pathways for violations of the statute, including civil penalty assessments, administrative appeal pathways, and audits initiated by the agency and/or manufacturers. *See* 42 U.S.C. §§ 256b(a) and (d)(3)(A)–(B).  For that reason, the Supreme Court has held that the federal 340B program is to be administered—and enforced—solely by or through the federal government.  State law claims seeking to separately enforce the 340B statute are preempted. *Astra*, 563 U.S. 110.

54.     The federal 340B statute mentions states only in passing and even then only in a limited way.  For example, the definition of covered entity includes hospitals that are "owned or

operated by a unit of State or local government"; "State-operated AIDS drug purchasing assistance program[s] receiving" certain federal "financial assistance"; and "entit[ies] receiving [federal] funds" to treat sexually transmitted diseases or tuberculosis "through a State or unit of local government" are all federally defined covered entities. 42 U.S.C. §§ 256b(a)(4)(E), (K), (L)(i).

55.     By purporting to create a separate, state-specific pathway that adjusts the contours of the federal 340B requirements—altering when the discount is owed, and overriding federal restrictions on who can enforce it—H.B. 728 runs afoul of the Supreme Court's admonition that using state law to enforce federal 340B requirements is "incompatible with the statutory regime." *Astra*, 563 U.S. at 113.  Congress has left "no room for the States to supplement it[s]" federal regulatory scheme. *Arizona*, 567 U.S. at 399.

56.     Field preemption also exists when a federal interest is so dominant that it must be assumed the federal system precludes enforcement of state laws covering the same subject.  The federal interests in overseeing and enforcing the 340B Program could hardly be more dominant. Congress directed HHS to create a comprehensive remedial scheme, which allows for federal enforcement as well as private ADR claims "to prevent overcharges and other violations of the discounted pricing requirements" and to govern disputes over 340B discount pricing.  42 U.S.C. §§ 256b(d)(1)(A), (d)(2)(A), (3); 42 C.F.R. §§ 10.3, 10.20.  Just as private lawsuits by state actors seeking to apply state common law to enforce 340B requirements are "incompatible with the [340B] statutory regime," so too is a state statute purporting to do the same thing.  *Astra*, 563 U.S. at 113.

### *Conflict Preemption*

57.     H.B. 728 also is preempted by the federal 340B statute under conflict preemption principles.  State laws are preempted under conflict principles where they stand as an obstacle to

the accomplishment and execution of the full purposes and objectives of Congress.  Conflict preemption is also found when a state law "interferes with the methods by which the federal statute was designed to" achieve those purposes and objectives.  *International Paper Co. v. Ouellette*, 479 U.S. 481, 492, 494 (1987).

### *Preemption by Federal 340B Statute*

58.   The Mississippi law is preempted by the federal 340B statute, in two ways.

59.   First, H.B. 728 conflicts with federal law by purporting to unilaterally expand the universe of 340B-eligible sales well beyond those required by the statute itself.  As the D.C. Circuit, the Third Circuit, the District Court for the District of Columbia, and the District Court for the District of Delaware recognized, the federal 340B statutory scheme does not require that a drug manufacturer honor unlimited contract pharmacy arrangements.  *See Sanofi Aventis*, 58 F.4th at 703; *see also Novartis Pharms. Corp.*, 2021 WL 5161783, at *6.  By Congressional design, whether to recognize covered entities' contract-pharmacy arrangements is purely a matter of manufacturer discretion.  Yet H.B. 728 purports to require manufacturers to make their 340B drugs available in connection with an unlimited number of contract pharmacy arrangements, in conflict with federal law as interpreted by multiple courts.

60.   In addition, H.B. 728 conflicts with the exclusive enforcement mechanism spelled out in the 340B statute.  Congress made its intent plain:  The federal 340B program must be enforced by a specialized federal administrative agency, and only that agency, through one of two centralized administrative processes: one driven by federal actors pursuing CMPs and other penalties, and the other driven by private claimants who file specified ADR claims before HRSA.

61.   In *Astra*, county-operated 340B facilities filed a lawsuit against various drug manufacturers, alleging that they were charging prices in excess of those permitted under the

manufacturers' PPAs.  563 U.S. 110.  The plaintiffs' claims were styled as third-party beneficiary claims for breach of contract under state law.  The Court rejected the plaintiffs' attempt to manufacture a state law right of action for violations of the 340B statute, noting: "Congress placed the Secretary (acting through her designate, HRSA) in control of § 340B's drug-price prescriptions.  That control could not be maintained were potentially thousands of covered entities permitted to bring suits alleging errors in manufacturers' price calculations."  *Id*. at 114.

62.     As with the state common law remedy that the Supreme Court overturned in *Astra*, H.B. 728 erects a substantial obstacle to that centralized federal process by creating a separate enforcement pathway for covered entities outside of the federal enforcement process. Mississippi's law flouts the oversight scheme mandated by Congress and allows covered entities to bypass federal enforcement pathways.  For all these reasons, H.B. 728 is unenforceable under the Supremacy Clause.  *See Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 326 (2016).

### Preemption by Federal Laws Governing Drug Exclusivity Periods and Patent Rights

63.     Finally, H.B. 728 is preempted by federal laws governing patent protection and regulatory exclusivity periods for drug products.  Congress has plenary authority under the U.S. Constitution to establish and oversee the patent laws, which provide a system of incentives "[t]o promote the Progress of Science and useful Arts."  Art. I, § 8, cl. 8.  In 1984, Congress enacted the "Hatch-Waxman" amendments to the FDCA, which among other things created a framework for patent litigation between brand manufacturers and generic manufacturers.  Under the resulting framework, innovative manufacturers are "impelled to invest in creative effort" on the promise that they will obtain "a federally protected 'exclusive right'" to sell their inventions for a limited period.  *Biotechnology Indus. Org. v. District of Columbia*, 496 F.3d 1362, 1371–74 (Fed. Cir. 2007) ("*BIO*").

64.    These patent exclusivity periods are distinctively federal and leave no room for state interference. "Where it is clear how the patent laws strike that balance in a particular circumstance, that is not a judgment the States may second-guess." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 152 (1989); *Southeastern Pennsylvania Transp. Auth. v. Gilead Scis., Inc.*, 102 F. Supp. 3d 688, 703 (E.D. Pa. 2015) ("Federal patent law contemplates the tradeoffs between exclusivity and access, and plaintiffs cannot use state law to adjust that balance by forcing Gilead to lower its prices or disgorge profits from the sale of its patented drugs.").

65.    State laws that cap or fix the prices at which patented drugs may be sold are preempted by federal patent law because they attempt to re-balance the carefully constructed federal statutory scheme that allocates rewards and incentives to innovator manufacturers. *See, e.g.*, *Pharmaceutical Rsch. & Mfrs. of Am. v. District of Columbia*, 406 F. Supp. 2d 56, 60 (D.D.C. 2005), *aff'd sub nom. Biotechnology Indus. Org. v. District of Columbia*, 496 F.3d 1362, 1371–74 (Fed. Cir. 2007) ("*BIO*").

66.    In *BIO*, the Federal Circuit held that a D.C. law that capped the price of patented pharmaceutical products was preempted by the federal patent laws. *See Biotechnology Indus. Org.*, 496 F.3d 1362. "Inventors are impelled to invest in creative effort by the expectation that, through procurement of a patent, they will obtain a federally protected 'exclusive right' to exclude others from making, using, or selling embodiments of their invention." *Id.* at 1372. The Court noted that the legislative history of the Hatch-Waxman Act supports this goal: "Patents are designed to promote innovation by providing the right to exclude others from making, using, or selling an invention. They enable innovators to obtain greater profits than could have been obtained if direct competition existed. These profits act as incentives for innovative activities." *Id.* at 1373 (citing legislative history). The Court thus found that the "underlying determination about

the proper balance between innovators' profit and consumer access to medication, though, is exclusively one for Congress to make"—and a state may not "re-balance the statutory framework of rewards and incentives insofar as it relates to inventive new drugs." *Id.* at 1374. "By penalizing high prices—and thus limiting the full exercise of the exclusionary power that derives from a patent—the District has chosen to re-balance the statutory framework of rewards and incentives insofar as it relates to inventive new drugs." *Id.* The Court thus found the D.C. law preempted.

67. The same delicate balance underlies the federal exclusivity periods awarded to drugs as part of the drug approval process. Congress has spelled out a grand bargain: Manufacturers are driven to research, develop, and bring to market pharmaceutical products through a rigorous New Drug Application pathway, which requires manufacturers to submit clinical trials showing safety and efficacy. Brand name manufacturers do so on the promise that they will obtain a federally protected, exclusive right to sell their products at market prices for a specified period of time after approval, known as a "regulatory exclusivity period."

68. Congress thus directed the Food and Drug Administration (FDA) to recognize various periods of market exclusivity following approval of new drugs in order to reward manufacturers for innovation undertaken at considerable risk and expense. *See* 21 U.S.C. §§ 355(c)(3)(E)(ii), (j)(5)(F)(ii) (five years exclusivity for new chemical entities not previously approved by the FDA); *id.* § 355(c)(3)(E)(iii)-(iv), (j)(5)(F)(iii)-(iv) (three years exclusivity to reward additional clinical testing for new indications or to develop new dosages); *id.* § 355a (six months additional exclusivity for pediatric clinical testing); *id.* § 360cc (seven years exclusivity for "orphan drugs" used to treat rare diseases).

69. Once those exclusivity periods expire, generic manufacturers are permitted to utilize the drug development work done by innovator manufacturers in order to obtain streamlined

approval of generic products—without the need to show safety or efficacy through clinical trials. The public reaps the benefit of immediate access to a new product during the innovator manufacturer's exclusivity period, and cheaper products once those periods expire.

70.     By requiring Novartis and other manufacturers of brand-name drugs to offer the steep 340B discount on sales made through contract pharmacy arrangements, even during the marketing exclusivity periods they are due under federal law, H.B. 728 impermissibly diminishes the reward that federal law confers on manufacturers, which in turn redounds to the benefit of patients who gain access to Novartis's life-saving and life-sustaining drug products.

**V. H.B. 728 Will Cause Concrete and Imminent Harm to Novartis.**

71.     Novartis will be irreparably harmed unless this Court enjoins Defendant from enforcing H.B. 728.

72.     First, if H.B. 728 is not enjoined, Novartis will be exposed to unconstitutional state-law obligations, and will risk violating Mississippi law by continuing with a policy that fully complies with federal law (as determined by multiple federal courts).  A regulated entity may be irreparably injured in the face of the threatened enforcement of a preempted law.  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).

73.     Failure to comply with the state law will also subject Novartis to state administrative enforcement proceedings that are themselves unlawful and unconstitutional.  These state pathways deprive Novartis of its rights under the carefully crafted, federally defined terms of the 340B Program enforcement pathways.  These deprivations of constitutional rights constitute irreparable injury for purposes of a preliminary injunction.

74.     Novartis also faces the prospect of significant financial penalties for violations of H.B. 728.  As noted above, the state statute contemplates civil and criminal penalties totaling of

up to $15,000 per violation, plus the potential for imprisonment.  H.B. 728.  Novartis thus risks

exposure to fines totaling millions of dollars per year plus imprisonment.  This money will divert

resources away from Novartis's research and development of new drug therapies for critical patient

populations.  Once lost, drug development research opportunities and market-leading opportunities

can never be fully regained.

75.     If Novartis tries to avoid these stringent fines and financial penalties by coming into

compliance with the state statute, Novartis faces the loss of millions of dollars in unconstitutional

state-mandated discounts per year.  Novartis has no readily apparent way to recover these

unlawfully mandated discounts once given.  In fact, HRSA's position is that a manufacturer may

only seek recovery through the federal ADR process only on claims relating to duplicate discounts

and drug diversion.  42 U.S.C. § 256b(d)(3)(A).

76.     Granting injunctive relief here would not harm Defendant, as it is well-established

that states maintain no interest in enforcing a statute that violates federal law.

77.     Injunctive relief also would serve the public interest.  The public has a substantial

interest in seeing that federal law is enforced and not countenancing state efforts to reset the metes

and bounds of participation in federal healthcare programs.

**CLAIM FOR RELIEF**

**COUNT I**
**(Declaratory/Injunctive Relief—**
**Preemption Under the Supremacy Clause, U.S. Const. art. VI, cl. 2)**

78.     Novartis realleges, reasserts, and incorporates by reference herein each of the

foregoing allegations as though set forth fully herein.

79.     The Supremacy Clause of the U.S. Constitution provides that Federal law is "the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

80.     H.B. 728 is preempted by the federal 340B statute under both field preemption and conflict preemption principles.

81.     First, H.B. 728 is preempted because it attempts to regulate in a field that Congress has fully occupied.  In crafting the 340B statute, Congress created a comprehensive and self-contained federal regime—one that carefully defines the types of entities that are entitled to receive the 340B discount, and provides its own enforcement pathways for violations of the statute, including civil penalty assessments, administrative appeal pathways, and audits initiated by the agency and/or manufacturers.  *See* 42 U.S.C. §§ 256b(a) and (d)(3)(A)–(B).  Congress left no room for states to tinker with the parameters of the federal law.  Nor is there space for states to add their own enforcement mechanisms to the two exclusive enforcement pathways spelled out in the federal statute.

82.     Field preemption also exists when a federal interest is so dominant that it must be assumed the federal system precludes enforcement of state laws covering the same subject.  The federal interests in overseeing and enforcing the 340B Program could hardly be more dominant.  Congress directed HHS to create an exclusive and comprehensive remedial scheme, which allows for federal enforcement as well as private ADR claims "to prevent overcharges and other violations of the discounted pricing requirements" and to govern disputes over 340B discount pricing.  42 U.S.C. §§ 256b(d)(1)(A), (d)(2)(A), (3); 42 C.F.R. §§ 10.3, 10.20.  State statutes that seek to adjust and enforce the federal 340B law are "incompatible with the [340B] statutory regime."  *Astra*, 563 U.S. at 113.

83.     H.B. 728 also is preempted because it imposes a substantial obstacle to the achievement of federal purposes and objectives under the 340B statute.  The Mississippi law requires manufacturers to provide the federal 340B discount on an unlimited number of transactions involving contract pharmacies.  Several federal courts (including the Third Circuit, the D.C. Circuit, and the District Court for the District of Columbia) have held that federal 340B law does *not* require manufacturers to recognize an unlimited number of contract pharmacies.  Yet that is precisely what Mississippi's H.B. 728 purports to mandate, greatly expanding the scope of the federal discounting obligation in conflict with federal law.

84.     H.B. 728 also conflicts with the federal 340B enforcement process by purporting to create its own state-level 340B enforcement mechanism.  Congress created two exclusive pathways to resolve disputes arising under the 340B statute: (i) direct enforcement by federal agencies, and (ii) an Administrative Dispute Resolution process that serves as the exclusive means for regulated entities to bring narrow types of private claims relating to 340B law.  Congress gave no authority to the States to administer, interpret, or enforce any aspect of the 340B Program.  Yet H.B. 728 purports to do exactly that.

85.     Finally, by purporting to reduce the value of the exclusivity periods and patent terms that the FDCA and federal patent laws guarantee to qualifying drug manufacturers, H.B. 728 is preempted under conflict preemption principles because it interferes with the careful balance of rewards and incentives that Congress crafted—a framework in which States simply play no role.

## PRAYER FOR RELIEF

For the foregoing reasons, Novartis prays for the following relief:

A.      A declaration pursuant to 28 U.S.C. § 2201 that H.B. 728 is preempted by federal law and is thus null, void, and unenforceable;

B.     Temporary, preliminary, and permanent injunctive relief vacating H.B. 728 and enjoining Defendant from implementing and/or enforcing H.B. 728 against Novartis or any of its affiliates, officers, agents, representatives, or contractors;

C.     Temporary, preliminary, and permanent injunctive relief enjoining Defendant from seeking civil penalties, equitable relief, or any other remedy based on an alleged violation under H.B. 728 by Novartis or any of its affiliates, officers, agents, representatives, or contractors;

D.     An order awarding Novartis attorneys' fees, costs, and expenses, as appropriate; and

E.     Such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: June 3, 2024

/s/ J. William Manuel
J. William Manuel (MS Bar No. 9891)
BRADLEY ARANT BOULT CUMMINGS LLP
One Jackson Place
188 E. Capitol Street, Suite 1000
Jackson, MS 39201
Telephone: (601) 948-8000
Facsimile: (601) 948-3000
wmanuel@bradley.com

Catherine E. Stetson*
Susan M. Cook*
Marlan Golden*
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
cate.stetson@hoganlovells.com
susan.cook@hoganlovells.com

*Pro Hac Vice Motion Forthcoming

Attorneys for Novartis Pharmaceuticals Corporation

## **<u>VERIFICATION</u>**

I, the undersigned, having read the allegations of the foregoing Verified Complaint, hereby declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 that the factual allegations asserted in the Verified Complaint are true and correct.

Executed this 3rd day of June, 2024.

_____
Odalys Caprisecca